UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROBERT NUCKLES,<br>Plaintiff | : | CIVIL ACTION NO. 301CV753(MRK) |
| | : | |
| V. | : | |
| | : | |
| UNITED STATES OF AMERICA,<br>Defendant | : | APRIL 30, 2004 |
| | : | |

## PLAINTIFF'S PRETRIAL BRIEF

**Introduction:**

On or about May 14, 1999 the plaintiff, Robert Nuckles, while in the employ of Electric Boat Corporation, was aboard a United States of America owned vessel known as barge YFNB-41. The barge was being used as a staging area for personnel assigned to work on a the nuclear submarine, USS HARTFORD (SSN 768), which was docked at the United States' Naval Submarine Base located in Groton, Connecticut.

At the time of the incident Mr. Nuckles was on the upper level of the barge near a safety chain surrounding a large opening leading down to the lower deck of the barge. While in the vicinity of the safety chain plaintiff's body came in contact with the safety chain which then became unsecured from its holding post causing plaintiff to fall backwards and down onto the lower deck floor, which was approximately twelve feet below.

EMBRY AND NEUSNER
P.O. BOX 1409  118 POQUONNOCK RD.  GROTON, CT 06340-1409  (860) 449-0341  JURIS NUMBER 102932

The chain and stanchion system around the cargo hold was designed and intended to prevent individuals from falling from the upper deck of the barge to the lower deck, even if an individual were to place their full weight against either the safety chain(s) or the stanchions. On the date of the plaintiff's fall the safety system around the cargo hatch was defective and dangerous. At some point prior to plaintiff's fall, a locking shackle had been replaced with a thin piece of wire at the connection point between a top chain and a stanchion. When the plaintiff leaned back against the top chain, the chain became detached from a stanchion due to the failure of the wire to support the plaintiff's weight. Had a proper shackle been in place, or if some other safety precaution been undertaken, such as covering the cargo hold with some type of cover, the plaintiff would not have fallen backwards down to the lower deck of the barge.

As a result of the fall Mr. Nuckles suffered injury to his neck, back, right shoulder, chest wall and a compound fracture of the distal radius ulna of the right wrist.  Mr. Nuckles has required extensive medical care and treatment including two surgeries to his right wrist involving an open reduction and pinning of the wrist, and a excision of a nonunited fragment of the distal radius along with release of the carpal canal and Guyon's canal. Mr. Nuckles was also caused to undergo a right anterior subcutaneous ulnar nerve transposition as well as extensive physical therapy and numerous diagnostic procedures.  Mr. Nuckles continues to suffer both mentally and physically due to his injuries.

As a further result of the incident, Mr. Nuckles was terminated from his employment with Electric Boat Corporation due to his inability to perform the job duties as an outside machinist. Prior to his injuries, Mr. Nuckles had been with the company for almost 20 years as an outside machinist and fully intended to continue to work for the company until old age forced him to hang up his tools.

Currently, Mr. Nuckles is undertaking a United States, Department of Labor, sanctioned retraining course through Quinebaug Valley Community College with the goal of achieving a Computer Science degree.

## Argument

The matter before the Court is an admiralty or maritime claim within Rule 9(h) of the Federal Rules of Civil Procedure. The Court has jurisdiction over admiralty claims. U.S. Const., Art. III, § 2; 28 U.S.C. § 1333(1). Sovereign immunity is waived by the provisions of the Public Vessels ACT ["PVA"], 46 U.S.C. app. §§ 781-790, which incorporates the consistent provisions of the Suits in Admiralty Act ["SAA'], 46 U.S.C. app. §§ 741-752, and provides a limited waiver of the United States sovereign immunity for certain maritime claims involving a public vessel. The Suits in Admiralty Act provides that "[i]n cases where if such a vessel were privately owned or operated, or if such cargo were privately owned or possessed, or if a private person or property was involved, a proceeding in admiralty could be maintained, any appropriate nonjury

proceeding in personam may be brought against the United States or against any corporation mentioned in section 1 of this Act." 46 U.S.C. § 742.

The claim in this matter is subject to the Longshore and Harbor Workers Compensation Act, as amended, 33 U.S.C. §§ 901-950 ["The Act"] being that plaintiff was an employee engaged in maritime employment as a ship repairman at the time of his injury. With sovereign immunity waived, plaintiff may sue the United States, as a vessel owner, for negligence under section 905(b) of "The Act" which provides, in pertinent part that: "in the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party... and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void." 33 U.S.C. § 905(b).

## A. Duty of Care:

General admiralty law governs claims resulting from injuries aboard United States owned vessels. A plaintiff must establish the elements of a negligence cause of action in admiralty, which are essentially the same as land based negligence under the common law. The elements are: 1) the existence of a duty of care owed to the plaintiff by the defendant; 2) a breach of the owed duty of care; 3) a causal connection between the claimed breach of duty and the resulting injury; and 4) actual injury, loss and/or damage suffered by the plaintiff as a result of the breach

of duty. <u>Pearce v. United States,</u> 261 F.3d. 643, 647, (6th Cir 2001), (quoting Thomas J. Schoenbaum, Admiralty and Maritime Law, § 5-2, at 170 (3d. 2001))

A vessel is defined in the Longshore And Harbor Workers" Compensation Act, 33 U.S.C.A. § 902(21), as: "any vessel upon which or in connection with which " the maritime worker suffers injury "arising out of or in the course of his employment, and the said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charter, master, officer, or crew member". 33 U.S.C.A. § 902(21). The essential elements for an action against a vessel under 905(b) are (1) a worker covered by the "Act", (2) who suffers injury on, or in connection with the vessel, (3) through the negligence of the vessel's owner, operator or its agents. 33 U.S.C. § 903(b)

In <u>Scindia Steam Navigation Co. v. De Los Santos,</u> 451 U.S. 156 (1981) the Supreme Court articulated a vessel's duty of care owed to the triangular relationship among a vessel owner, an independent stevedoring contractor and an injured longeshoreman employed by the stevedore under section 905 (b) of the Longshore And Harbor Workers' Compensation Act, as amended. <u>33 U.S.C. § 905 (b)</u> In Scindia, a longshoreman employed by a stevedore was injured from falling cargo from a pallet which was being lowered into a cargo hold by a fellow employee of the stevedore. The Court defined three duties that may be applicable to the scope of a vessels duty of care when dealing with the services of stevedores employed by the vessel in the context of a third party action under § 905 (b).

The first duty arises where the injury-causing condition is present on the vessel prior to the commencement of activities by the stevedoring contractor and his employees. This duty has become known as the "turnover duty". The vessel owner must make his vessel reasonably safe for the performance of the work by a competent maritime employer. This means that a vessel owner has a duty to exercise reasonable care to discover latent or hidden defects in the vessel which are likely to be encountered by maritime workers not in the employ of the vessel and to either correct the defect prior to the arrival of the maritime workers or to warn the employer of the maritime workers of the defect. Scindia, 451 U.S. 166 – 167

The second duty arises in situations after the maritime employer commences his activities. This duty has become known as the "active control duty". An owner of a vessel owes a continuing duty to exercise reasonable care to make a vessel safe (a) if he actively participates in the operations, or (b) if he maintains control over the area, or (c) if such a duty is imposed upon his by contract, positive law (such as federal regulations) or custom. Scindia, 451 U.S. 167.

The third duty arises when a vessel owner obtains actual knowledge during the course of the maritime employer's activities that a dangerous condition exists which presents a risk of harm to the maritime employees on the vessel, or that the maritime employer has failed to guard against an "open and obvious" condition existing prior to the commencement of the maritime activities. Here the vessel owner "must intervene if it acquires actual knowledge that (1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) the stevedore

is not exercising reasonable care to protect its employees from that risk". <u>Scindia</u>, 451 U.S. 175

-76. This duty has become known as the "duty to intervene".

The duties articulated in <u>Scindia</u>, if found to be applicable to this matter, do support the

finding of negligence on the part of the defendant in this matter.

The first duty, "the turn over duty", relates to condition of the vessel upon the

commencement of work to be performed by stevedoring operations. The defendant has argued

that the barge in question was turned over to Electric Boat Corporation, even though Portsmouth

Naval Shipyard continued to use the barge in furtherance of its own business. If the court finds

the barge was turned over to Electric Boat by the defendant then the defendant had a duty to

exercise "ordinary care under the circumstances to have the ship and its equipment in such

condition that an expert and experienced stevedore will be able by the exercise of ordinary care

to carry on its cargo operations with reasonable safety. The defendant also has a duty to warn

the plaintiff of "any hazards on the ship or with respect to its equipment that are known to the

vessel or should be known to it in the exercise of reasonable care..." <u>Scindia</u>, 451 at 167.

"[T]he shipowner's duty to warn the stevedore of hidden dangers necessarily implies a duty to

inspect to discover those dangers." <u>Howlett v. Birkdale Shipping Co.</u>, 512 U.S. 92, 100 (1994)

quoting <u>Kirsch v. Plovidba</u>, 971 F.2d 1026, 1029 (1992). If the defendant in this matter in fact

turned the barge over to the exclusive use of Electric Boat employees, which is disputed, it owed

a duty to plaintiff to inspect the barge for dangers prior to the turn over, which it failed to do.

Under the "active control duty" a vessel owner has been held not liable to longshoremen for injuries caused by dangers unknown to the owner and for which he had no duty to inform himself. This does not mean that a vessel owner can turn a blind eye to dangers maritime workers may encounter upon the vessel, which were discoverable by reasonable inspection. If a contract provision, positive law or custom is applicable, defendant has an ongoing duty to exercise reasonable care. Scindia, 451 U.S. at 172. Here, the custom in the industry is the vessel owner to inspect safety lines on a daily basis, and/or to take other reasonable measures which would prevent maritime workers from falling through open decks, which the defendant failed to do. Nobody from Portsmouth Naval Shipyard can even articulate how long, even within years, when the last time prior to plaintiff's injuries a general safety inspection had been undertaken on the subject barge.

The duty to intervene has been found to be applicable when a vessel owner or operator has "actual knowledge of (1) a risk created by a dangerous condition; and 2) a high probability that the stevedoring entity or other contractor will not exercise reasonable care under the circumstances to protect its employees from that risk." O'Hara v. Weeks Marine, Inc., 294 F.3d. 55, 65 (2002) (citing Gravatt v. City of New York, 226 F3d. at 12; Scindia, 451 U.S. at 175-76.) In this matter a question of fact exists as to who removed the connecting shackle. It is most probable that the defendant, and/or his agent(s) removed the shackle and thus would have had actual knowledge of the dangerous condition.

Under all three of the Sindia duties, it can be shown that the defendant breached its duty of reasonable care owed to the plaintiff.

## B. Restatement § 343 A

General maritime law imposes a duty to exercise reasonable care or ordinary care under the circumstances, a duty which includes a duty to warn of foreseeable dangers. This general duty to exercise reasonable care or ordinary care is articulated in § 343 A of the Restatement (Second) of Torts. Section 343 provides: A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involved an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (C) fails to exercise reasonable care to protect them from the danger.

The Second Circuit has adopted the standard set forth in § 343A of the Restatement. Fanetti v. Hellenic Lines Ltd. 687 F 2d 424 (2d Cir. 1982); Mack Moore v. M.P. Hewlett, Inc., 704 F2d 39 (2d Cir. 1983); Sinagra v. Atlantic Ocean Shipping, Ltd., 182 F. Supp 2d 294, 301 (E.D.N.Y. 2001).

An open cargo hold is clearly a dangerous condition if proper safety precautions are not taken to prevent persons or objects from falling down on the lower deck. If the defendant had

undertaken a reasonable inspection of the barge prior to plaintiff's injury, it would have discovered the dangerous condition of the chain attached to the shackle via a small piece of wire. Defendant, as owner of the barge, had directed plaintiff to use the area near the open cargo hold as his work area.

Defendant knew or should have known that by assigning the plaintiff to the area created an unreasonable risk of harm. Defendant cannot argue that the plaintiff assumed the risk. Assumption of risk is not a defense in a Longshore and Harbor Workers' Compensation Act claim. The "Act" establishes a comparative rather than a contributory negligence scheme. Evans v. Transportacion Maritime Mexicana, 639 F2.2d 848, 852 (2d Cir. 1981) "A shipowner is not relieved of liability as a matter of law simply because it relied ... on the stevedore's judgment to proceed with the work in spite of [a dangerous] condition." Moore v. M.P. Howlett, Inc., 704 F.2d 39, 42 (2d Cir. 1993)

## C. Concurring Negligence

If the injury to a maritime worker is caused by the concurring negligence of his employer and a third party, such as the vessel or vessel owner, the third party is liable for the full damages owed the maritime worker as a joint tortfeasor. Edmonds v. Compagnie Generale Transatlantique, 43 U.S. 256, 264, (1979) "As we have said, § 905 permits the injured longshoreman to sue the vessel and exempts the employer from any liability to the vessel for any damages that may be recovered. Congress clearly contemplated that the employee be free to sue

the third-party vessel, to prove negligence and causation on the vessels part, and have the total damages set by the court or the jury without regard to the benefits he has received or to which he may be entitled under the Act. Furthermore, under the traditional rule, the employee may recover from the ship the entire of the amount of the damages so determined. ... Under this arrangement, it is true that the ship will be liable for all of the damages found by the judge or jury; yet its negligence may have been only a minor cause of the injury. The stevedore-employer may have been predominantly responsible; yet its liability is limited by the Act..." Edmonds, pp. 268-269.

The defendant cannot defeat its liability by claiming Electric Boat Corporation was responsible for inspection and safety on the barge.

### D. Comparative Negligence:

Comparative negligence on the part of the plaintiff, if any,  is the proper doctrine to apply for assessing any fault on behalf of a plaintiff  under general maritime law. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 408-409 (1953)

### E. OSHA

Occupational Safety and Health Standards for Shipyard Employment (OSHA) 29 CFR part 1915, applicable "to all ship repairing", 29 CFR § 1915.2 requires that compliance with the regulation is placed upon the employer, "However, this part is not intended to relieve owners, operators, agents or masters of vessels who are not "employers" from responsibilities or duties now placed upon them by law, regulation or custom"

Violations of an OSHA regulation is evidence that may be used with all other evidence in deciding whether the defendant was negligent. <u>Gallardo v. Westfal-Larson & Co.</u>, 435 F. Supp. 484 , 501 (N.D. Cal. 1977); <u>Darwin v. United States,</u> 435 F. Supp. 501, 508 (N.D. Cal 1977). It is expected that plaintiff's expert will testify as to  OSHA violations in this matter which certainly can be considered by the court in assessing the negligence of the defendant.

## F. Barrowed Servant:

The defendant has argued that plaintiff was acting as a federal employee at the time of his injury. This is legally impermissible under the Longshore Harbor Workers' Compensation Act. 33 U.S.C.A § 903(b) holds: "No compensation shall be payable in respect of disability or death of an officer or employee of the United States, or any agency thereof…" There is no dispute that the United States can contract for services by non governmental vendors, but this does not legally make the employees of the contractors or subcontractors federal employees.

The defendant argues that Pertsmouth Naval Shipyard, through contract "borrowed" 31 Electric Boat employees in order to "augment its workforce".  It is a violation of the Civil Service Laws, and legally impermissible, for the United States federal Government to enter into contract with a non-governmental employees who may simply receive there assignments from government employees. <u>Trevino v. General Dynamics Corp.</u>, 626 F.Supp. 1330, 1339 (E.D. Tex 1986) (citing 5 U.S.C. § 3109)

In determining whether an employee is a barrowed servant, cooperation between the employee and the alleged borrowing employer, as distinguished from subordination, is legally insufficient to create an employment relationship. To determine the status of an employee "we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." Standard Oil Company v. Anderson, 212 U.S. 215, 221 – 222. (1909)

The plaintiff was employed by Electric Boat Corporation for almost twenty years prior to his injury. Electric Boat Corporation continually paid the plaintiff, provided plaintiff with employee benefits, and continued its employer/employee relationship with plaintiff until it was determined plaintiff could no longer perform his duties for Electric Boat Corporation due to plaintiff's injuries suffered in this matter. Electric Boat Corporation is and has been responsible for payment of benefits under the Longshore and Harbor Workers' Compensation Act.

The defendant entered into an agreement with Electric Boat Corporations to do some repair work on a United States owned vessel known as the USS HARTFORD. Electric Boat Corporation was selected for this contract due to its specialty in submarine construction and repair. It would only be natural to request Electric Boat Corporation to do repair work on the

USS HARTFORD being that Electric Boat Corporation constructed the vessel for the United States Navy in the first place.

The defendant argues this court to adopt the borrowed servant doctrine in the context of the LHWCA. Though the court may wish to do this, it still will find that there was no such legal relationship created between the plaintiff and the defendant. Portsmouth Naval Shipyard may have had the ability to suggest general working hours and general working arrangements for Electric Boat employees but it did not control or supervise the particulars or actual details of the work performed by Electric Boat employees.

The Fifth Circuit has outlined nine factors to determine whether the borrowed employee doctrine applies. <u>Ruiz v. Shell Oil Co.</u>, 413 F.2d 774, 777 (5th Cir 1969)  The <u>Ruiz</u> factors are:

    a.  Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

    b.  Whose work is being performed?

    c.  Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

    d.  Did the employee acquiesce in the new work situation?

    e.  Did the original employer terminate his relationship with the employee?

    f.  Who furnished [the] tools and place for performance?

    g.  Was the new employment over a considerable period of time?

    h.  Who had the right to discharge the employee?

i.   Who had the obligation to pay the employee?

An examination of the factors together clearly show that the plaintiff was an Electric Boat employee who was assigned to the United Submarine Base to work on a submarine, USS HARTFORD, which had been previously built by Electric Boat Corporation.

a. Who had control over the plaintiff and the work he was performing, beyond mere suggestion of details or cooperation?

Plaintiff was under the direct supervision of his foreman, Charlie Martin, an Electric Boat employee.

b. Whose work was being perform?

Clearly the work being performed was the work of Electric Boat Corporation; the only business Electric Boat does is construction and repair of submarines. The work was for the benefit of the defendant but was performed by Electric Boat Corporation.

c. Was there an agreement, understanding, or meeting of the minds between the original and borrowing employer?

Plaintiff was not privy to any contract that may have been entered into between Electric Boat and the defendant. Plaintiff was simply informed that he would be working at the U.S. Submarine Base and would report to Charles Martin, his foreman.

d. Did the employee acquiesce in the new work situation?

Plaintiff considered himself to be an Electric Boat employee, not a federal employee.

e. Did the original employer terminate his relationship with the employee.

No. Plaintiff continued to work exclusively for Electric Boat, not the federal government. Mr. Nuckles reported to his regular foreman, Mr. Charles Martin.

f. Who furnished the tools and place for performance.

Plaintiff provided his own personal tools and protective equipment. Depending on the job needs, plaintiff would receive specialized tools from either Electric Boat or Portsmouth Naval Shipyard. The defendant did supply the defective barge as the assigned work area.

g. Was the new employment over a considerable period of time?

No. Plaintiff was working on the USS Hartford for approximately four weeks prior to his injury. The repairs to the USS HARTFORD were such that the job was to be completed as soon as possible.

h. Who had the right to discharge the employee?

Only Electric Boat Corporation. Since plaintiff was not a federal employee, he could not be terminated by the defendant.

i.     Who had the obligation to pay the employee?

Plaintiff only received pay from his employer, Electric Boat Corporation. Defendant argues that since it paid for the repairs to the USS Hartford plaintiff became a barrowed employee. If this was true, all Electric Boat employees would be federal employee since the only customer Electric Boat has is the United States Government.

Although no single factor or combination is determinative, the issue of control as articulated in Standard Oil Co. v Anderson, 212 U.S. 215, 222, (1919) is perhaps the most important factor. The question then becomes a determination of cooperation as distinguished from subordination. Here, plaintiff was simply fulfilling his duties as an electric boat employee at the time of injury

## CONCLUSION

The evidence will show that the barge was defective on the date of plaintiff's injuries in that a safety chain was attached to a steel support by a piece of wire. The defendant had an affirmative duty to inspect for dangers on its vessel as well as correct known dangers. The defendant failed to act reasonable and is negligent in this matter. The defendant cannot claim the defect on the plaintiff nor can it escape liability by claiming Electric Boat Corporation should have detected the defect. The evidence will further show that plaintiff was at all times relevant hereto an employee of Electric Boat Corporation and not a borrowed servant as defendant suggests.

Respectfully submitted,

THE PLAINTIFF
ROBERT NUCKLES

By:

ERIC J. LAND
EMBRY & NEUSNER
118 Poquonnock Road
Groton, CT 06340
(860) 449-0341
Federal Bar #: ct12851

## CERTIFICATION OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was sent by Federal Express this 30th day of April 2004, to the following:

Attorney Michael Dilauro
Attorney Stephen G. Flynn
U.S. Department of Justice
P.O. Box 14271
Washington, D.C. 20044-4271

By: _____
ERIC J. LAND
EMBRY & NEUSNER
118 Poquonnock Road
Groton, CT 06340
(860) 449-0341
Federal Bar #: ct12851