## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ROBERT NUCKLES,        )
                              )
        Plaintiff,       )
                              )
        v.            )    CIVIL NO. 3:01 CV 753 (MRK)
                              )
UNITED STATES OF AMERICA,  )
                              )
        Defendant.    )

## THE UNITED STATES' PROPOSED FINDINGS
## OF FACT AND CONCLUSIONS OF LAW

COMES NOW Defendant United States of America, by and through counsel, to

offer its Proposed Findings of Fact and Conclusions of Law, as follows:

### FINDINGS OF FACT

(1)    On or about May 14, 1999, Mr. Robert Nuckles was a civilian employee of

Electric Boat working at Naval Submarine Base New London, located in Groton,

Connecticut. Joint Trial Memo.[1], Stip., ¶ 5.a.

(2)    He suffered an accident while on board YNFB-41, a U.S. Navy owned utility

barge. JTM, Stip., ¶ 5.a. The barge was used as a staging area by the repairmen

who performed work aboard the submarines berthed nearby. Test. Bailey.

(3)    Portsmouth Naval Shipyard is a Navy facility headquartered in Kittery, Maine,

which performed submarine repairs and maintenance on the Navy's nuclear

---

[1]Hereinafter referred to as "JTM."

submarine USS HARTFORD (SSN 768), during the months of April, May and June 1999, pierside at Naval Submarine Base New London.  Test. Martin, Fender, Bailey & Parys; Ex. 530 & 531.

(4)    To augment its workforce, Portsmouth Naval Shipyard, through a labor agreement, "borrowed" 31 Electric Boat employees, including Mr. Nuckles, who were characterized as "production support," for these three months.  Def. Ex. 531.

(5)    The work performed by Electric Boat supervisors and mechanics was overseen by Portsmouth Naval Shipyard zone managers, including Mr. Steven Bailey.  Test. Bailey; Def. Ex. 531, § 3, ¶ 3 (Workforce Mgt. Rqts).

(6)    The United States retained the right to control working hours, overtime and work assignments.  Def. Ex. 531, § 3, ¶ 6.

(7)    Mr. Bailey could and did directly control Mr. Nuckles and the other mechanics through the supervisors, also known as foremen.  Test. Martin, Gaynor & Bailey.

(8)    As the zone manager, Mr. Bailey was responsible for all activities that occurred on his shift.  Test. Martin, Gaynor & Bailey.

(9)    Mr. Bailey used Electric Boat and Portsmouth Naval Shipyard personnel interchangeably during the repair.  Test. Bailey.

2

(10)    The work performed during the HARTFORD selected restrictive availability ("SRA")[2] period was that of the United States. Test. Fender, Bailey and Parys; Def. Ex. 531.

(11)    Electric Boat builds new nuclear submarines for the U.S. Navy. Test. Fender. Aside from major overhauls, which are sometimes contracted out, the Navy repairs and maintains its submarines without outside assistance. Test. Fender, Martin and Gaynor. The Navy's ability to do this began to be diminished significantly in the mid-1990's through reductions in workforce imposed for budgetary reasons. Test. Fender. By the late 1990's, the Navy, and Portsmouth Naval Shipyard in particular, had fewer qualified mechanics than needed to perform deferred maintenance on its nuclear submarines. Id. To perform the work, the Navy entered into a collaborative arrangement, described as "partnering," that resulted in a pooling of Portsmouth Naval Shipyard and Electric Boat employees. Test. Fender and Parys; Def. Ex. 530 & 531. The repair of nuclear submarine USS HARTFORD (SSN 768), from April through June 1999, is an example of the partnering arrangement in effect.

(12)    A meeting of the minds existed: Portsmouth Naval Shipyard needed to augment its workforce with Electric Boat mechanics to have the ability to make necessary

---

[2]    SRAs allow repairs and maintenance to be accomplished pierside, without putting the submarine into a yard and taking it out of service for long.

repairs to HARTFORD. Electric Boat, which was building fewer new submarines, needed to keep Mr. Nuckles and others gainfully employed. To satisfy the needs of both organizations, they entered into a "partnering" arrangement. The partnering arrangement, which affected Mr. Nuckles and others, allowed the pooling of two workforces, one public and one private. It was through this arrangement that Mr. Nuckles was assigned to perform repairs on the HARTFORD, an effort managed by the United States. Test. Fender; Ex. 530 & 531.

(13)   Mr. Nuckles began working as an outside machinist for Electric Boat in 1981. Test. Nuckles. Until his accident on May 14, 1999, he worked continuously as an outside machinist on nuclear submarines built for the Navy. Id. When required in the past, he worked on board YNFB-41, the site of his accident. Id. He was familiar with conditions on board YNFB-41; and, he knew that Electric Boat and the government were separate entities. Id. There is no evidence that suggests Mr. Nuckles objected to his work environment or to the tasks he was asked to perform; he acquiesced in this arrangement.

(14)   During the time of the HARTFORD availability, Mr. Nuckles worked only on HARTFORD, not new submarine construction. Test. Nuckles. Electric Boat relinquished control over Mr. Nuckles during the period he worked on the HARTFORD. Test. Bailey.

(15)   While Mr. Nuckles provided his own personal protective equipment and hand tools, the government provided specialized tools and equipment, as well as the work spaces for all personnel assigned to the HARTFORD job. Test. Bailey; Def. Ex. 531, § 3 (Workforce Mgt. Rqts), ¶ 4.

(16)   The outside machinists' lockers, both government and Electric Boat machinists, were co-located. Test. Bailey. They acted as a common workforce. Id.

(17)   The United States/Electric Boat contract gave the United States authority to terminate Electric Boat's loaned employees. Def. Ex. 531, § 3 (Workforce Mgt. Rqts), ¶ 8.

(18)   Mr. Bailey could terminate Mr. Nuckles and the other Electric Boat employees from the HARTFORD availability and would have done so if necessary. Test. Bailey. His handling of such a situation would not differ depending on whether the employee was an Electric Boat or a government worker. Id.

(19)   The United States had the authority to exclude Mr. Nuckles from Naval Submarine Base New London, where YNFB-41 and HARTFORD were located. Test. Bailey.

(20)   While Electric Boat paid Mr. Nuckles, it was reimbursed by the government for the total hours worked by all outside machinists supplied by Electric Boat. Test. Parys. In addition, the United States paid most of his worker's compensation on a pass-through basis after his accident because this too was an allowable cost under the contract. Id.

5

(21)   The Court finds that the United States was borrowing Mr. Nuckles' services from Electric Boat, which acted as the "lending employer," when he suffered his accident on May 14, 1999.

(22)   Mr. Nuckles' locker was placed flush against a four-inch high coaming that surrounded an open cargo hatch. See generally Def. Ex. 501-503 & 534.a-534.h. The cargo hatch was surrounded by safety stanchions, with two chains, upper and lower, suspended between them. Id. At one end, the chain was shackled to the stanchion and, at the other, it was secured by a "hook and eye," to allow removal for loading. Id.

(23)   When his accident occurred, during the work shift, Mr. Nuckles was gathering tools and making plans with a co-worker, Mr. Michael Foltz, to complete their next assignment, the taking of "stave bearing readings," on board the submarine. Test. Nuckles and Foltz. As they spoke, Mr. Nuckles sat on his locker, leaned back against the upper chain and rested his arms upon it. JTM, Pl. contentions, ¶ 6; Test. Foltz; Def. Ex. 504-509. The chain gave way and Mr. Nuckles fell backward through the cargo hatch onto the deck below. Id.

(24)   It is unclear which end of the chain, which did not break, separated from the stanchion. Although he personally does not know why the chain gave way, Mr. Nuckles contends it did so because it was improperly attached to the stanchion with wire at the closed end, instead of a shackle. Conversely, defendant's expert

6

believes the hook-end of the chain was inadvertently lifted from the "eye" welded

to its stanchion by Mr. Nuckles as he unwisely reclined upon it.  Test. Klein; Def.

Ex. 514.  If an unsafe condition existed, it is not known when it arose.

(25)   Mr. Nuckles' locker was, and had been for weeks, situated directly in front of the

chain through which he fell.  Test. Nuckles, Gaynor, Foltz, Bailey; Def. Ex. 501.c,

502 & 503.

(26)   There is no evidence the United States knew of any unsafe condition affecting the

chain, nor that it might have uncovered such in the normal course of operations.

(27)   Although unable to return to his former job, Mr. Nuckles has been capable of

performing less arduous work since August 2000 when he returned to Electric

Boat, on light duty, for a month.  Test. Cestar; Def. Ex. 516.  He has not been

employed since that time, but has instead been a student of computer science at

Quinebaug Valley Community College, Danielson, Connecticut.  Test. Nuckles.

He intends to earn his associates degree and work as an assistant computer

network manager and will earn as much or more than his former wage level at his

new job.  Id.

## CONCLUSIONS OF LAW

(1)   The matter before the court is an admiralty or maritime claim within Rule 9(h) of

the Federal Rules of Civil Procedure.  The Court has jurisdiction over admiralty

claims.  U.S. Const., Art. III, § 2; 28 U.S.C. § 1333(1).

7

(2)     The sovereign immunity of the United States is waived by the provisions of the

Public Vessels Act ["PVA"], 46 U.S.C. app. §§ 781-790, which incorporates the

consistent provisions of the Suits in Admiralty Act ["SAA"], 46 U.S.C. app. §§

741-752, and provides a limited waiver of the United States' sovereign immunity

for certain maritime claims involving a public vessel.

(3)     YNFB-41, a barge owned by the U.S. Navy, is a public vessel within the meaning

of 46 U.S.C. § 30101(3), which defines a public vessel as "a vessel that is owned,

demise chartered, or operated by the United States Government or a government of

a foreign country."

(4)     Mr. Nuckles was engaged in maritime employment as a ship repairman.  33 U.S.C.

§ 902(3); Gravatt v. City of New York, 226 F.3d 108, n. 6 (2d Cir. 2000); Sinagra

v. Atlantic Ocean Shipping, Ltd., 182 F.Supp. 2d 294, 299 (E.D.N.Y. 2001).  Thus,

his claim is governed by the Longshore and Harborworkers' Compensation Act, 33

U.S.C. §§ 901-950 ["LHWCA"].

(5)     The LHWCA makes the employer liable for workmen's compensation

"irrespective of fault as a cause for the injury."  33 U.S.C. §§ 904, 907, 908, 909.

The strict liability claim against the employer is the harborworker's primary

compensation.

8

(6)     When two or more organizations could conceivably be an individual's employer, the borrowed servant test is applied to decide which is the actual employer. Am. Stevedoring Ltd., v. United States, 248 F.3d 54, 64 (2d Cir. 2001).

(7)     As a borrowed servant, Mr. Nuckles' exclusive remedy against his "borrowing employer," the United States in this instance, consists of the benefits paid to him under the Longshore and Harborworkers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901-950. The LHWCA provides that his exclusive remedy consists of the collection of worker's compensation benefits that he is entitled to through 33 U.S.C. § 905(a). His recourse against the United States, the borrowing employer, and Electric Boat, his nominal employer, are one in the same. Although entitled to worker's compensation, he may not receive damages in tort.

(8)     The Second Circuit has not yet had the opportunity to affirm that the borrowed servant doctrine applies in the context of the LHWCA. See O'Hara v. Weeks, 294 F.3d 55, 68 (2d Cir. 2002). Other circuits that have considered the issue uniformly agree that it does. See White v. Bethlehem Steel Corp., 222 F.3d 146, 149 (4th Cir. 2000); Peter v. Hess Oil V.I. Corp., 903 F.2d 935, 939 (3d Cir. 1990); Ruiz v. Shell Oil Co., 413 F.2d 310 (5th Cir 1969); see also Rodriguez v. Barge Foss 343, 999 AMC 1593, 1595-96 (W.D. Wash. 1998) (applying the borrowed servant doctrine) and Canty v. A. Bottacchi, S.A., et al., 849 F.Supp. 1552, 1558-59 (S.D. Fla. 1994) (same).

9

(9)    Of the Third, Fourth and Fifth Circuits, the borrowed servant general maritime law

of the Fifth Circuit has been around the longest, more than thirty years, and is most

developed.  The Fifth Circuit applies an extensive nine-factor test originally set

forth in Ruiz v. Shell Oil Co., 413 F.2d at 312-13 ("Ruiz test").  The Ruiz factors

are:

a.    Who has control over the employee and the work he is performing,
      beyond mere suggestion of details or cooperation?

b.    Whose work is being performed?

c.    Was there an agreement, understanding, or meeting of the minds
      between the original and the borrowing employer?

d.    Did the employee acquiesce in the new work situation?

e.    Did the original employer terminate his relationship with the
      employee?

f.    Who furnished [the] tools and place for performance?

g.    Was the new employment over a considerable period of time?

h.    Who had the right to discharge the employee?

i.    Who had the obligation to pay the employee?

Melancon v. Amoco Prod. Co., 834 F.2d 1238, 1244 (5th Cir. 1988).  An

examination of these factors shows that Mr. Nuckles meets each of them.  He was

a borrowed servant of the United States and, as such, his recovery is limited to his

worker's compensation benefits.  Taking each factor in turn:

10

(a)     Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?  The U.S. Navy, through Portsmouth Naval Shipyard, had control over Mr. Nuckles and the work he was performing.  The control factor is the most significant of the Ruiz factors.  See, e.g., White v. Bethlehem Steel Corp., 222 F.3d at 147-48, and Hebron v. Union Oil Co. of Cal., 634 F.2d 245, 247 (5th Cir. 1981).  The United States' control is demonstrated by:

1.     The United States/Electric Boat contract, through which Portsmouth Naval Shipyard "borrowed" 31 Electric Boat employees, characterized as "production support" for three months.  Def. Ex. 531.  It allowed the Navy to supplement its workforce with Electric Boat workers.  Id.

2.     The oversight of Electric Boat supervisors and mechanics by Portsmouth Naval Shipyard zone managers, including Mr. Steven Bailey, and its project manager.  Test. Bailey; Def. Ex. 531, § 3, ¶ 3 (Workforce Mgt. Rqts).

3.     The United States retention of the right to control working hours, overtime and work assignments.  Def. Ex. 531, § 3, ¶ 6.

4.     Mr. Bailey's directly control Mr. Nuckles and the other mechanics through his supervisors.  Test. Martin, Gaynor & Bailey.

11

     5.      Mr. Bailey's responsibility for all activities that occurred on his shift. Test. Martin, Gaynor & Bailey.

     6.      Mr. Bailey's interchangeable use of Electric Boat and Portsmouth Naval Shipyard foremen and mechanics. Test. Bailey.

(b)    Whose work is being performed? In applying the second factor, the Court must evaluate whose work is being performed. Standard Oil v. Anderson, 212 U.S. at 220; White v. Bethlehem Steel Corp., 222 F.3d at 149; and, Melancon v. Amoco Prod. Co., 834 F.2d at 1244. Without question, the work performed by Mr. Nuckles during the HARTFORD availability was that of the United States, repairs to its nuclear submarine HARTFORD. When his accident occurred, during the work shift, he was gathering tools and making plans with a co-worker, Mr. Michael Foltz, to complete their next assignment, the taking of "stave bearing readings" on board the submarine. Test. Foltz.

(c)    Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer? The third of the nine factors requires a meeting of the minds between the United States and Electric Boat. Melancon v. Amoco Prod. Co., 834 F.2d at 1244. A meeting of the minds existed: Portsmouth Naval Shipyard needed to augment its workforce with Electric Boat mechanics to make necessary repairs to

HARTFORD; Electric Boat, which was building fewer new submarines, needed to keep Mr. Nuckles and others gainfully employed. To satisfy the needs of both organizations, they entered into a "partnering" arrangement. Fender Test. The partnering arrangement, which affected Mr. Nuckles and others, allowed the pooling of two workforces, one public and one private. Test. Fender and Bailey; Def. Ex. 531. Through this arrangement, Mr. Nuckles was assigned to perform repairs on the HARTFORD, an effort managed by the United States. Id.

(d)     Did the employee acquiesce in the new work situation? As to the fourth factor, Mr. Nuckles acquiesced in his new work situation. He began working as an outside machinist for Electric Boat in 1981. Test. Nuckles. Until his accident on May 14, 1999, he worked continuously as an outside machinist on nuclear submarines built for the Navy. Id. Periodically, as circumstances required, he worked on board YNFB-41, the site of his accident. Id. He was familiar with the working conditions on board YNFB-41; and, he knew that Electric Boat and the government were separate entities. Id. There is no evidence that he objected to his work environment or to the tasks he was asked to perform.

(e)     Did the original employer terminate his relationship with the employee? The fifth <u>Ruiz</u> factor does not require complete termination of the

13

relationship between the nominal employer, Electric Boat, and Mr. Nuckles; rather, it requires a temporary relinquishment of control during the period of borrowed employment. Melancon v. Amoco Prod. Co., 834 F.2d at 1246; Capps v. N.L. Baroid-Indus., Inc., 784 F.2d 615, 617-18 (5th Cir. 1986). The emphasis in evaluating this factor is on Electric Boat's relationship with Mr. Nuckles during the period that work was performed on HARTFORD. Melancon v. Amoco Prod. Co., 834 F.2d at 1246. During the time of the HARTFORD availability, Mr. Nuckles worked only on HARTFORD, not new submarine construction. Test. Nuckles. Hence, Electric Boat effectively relinquished control over Mr. Nuckles during the period he worked on the HARTFORD. Test. Bailey.

(f)    Who furnished [the] tools and place for performance? The sixth Ruiz factor is met because, although Mr. Nuckles provided his own personal protective equipment and hand tools, the government provided specialized tools and equipment, as well as the work spaces for all personnel assigned to the HARTFORD job. Test. Bailey; Def. Ex. 531, § 3 (Workforce Mgt. Rqts), ¶ 4.

(g)    Was the new employment over a considerable period of time? The seventh factor looks at whether the period of borrowed employment spans a considerable period of time. There is no bright-line rule that defines a

14

"considerable period of time." Mr. Nuckles' accident occurred approximately five weeks into, or half way through, the HARTFORD job. In comparison, in <u>Capps v. N.L. Baroid-Indus., Inc.</u>, 784 F.2d 618, the Court found plaintiff to be a borrowed servant even though that accident occurred on the first day of employment. The Court opined that, while employment over a long period suggests borrowed servant status, employment for a short period does not inveigh against it. <u>Id.</u> If so, this element of the test would eliminate the application of the doctrine in the early days of a borrowed servant's employment. <u>See</u> <u>also</u> <u>Brown v. Union Oil Co. of Cal.</u>, 984 F.2d 674, 679 (5th Cir. 1979) (one month employment period is neutral); and, <u>Canty v. A. Bottacchi, S.A., et al.</u>, 849 F.Supp. 1552, 1558-59 (S.D. Fla. 1994) (three days of employment is neutral).

(h)   Who had the right to discharge the employee?  The right of discharge does not require that the United States have the ability to terminate Mr. Nuckles' employment with Electric Boat; rather, it requires only that the United States have the right to remove him from the job itself.  As the Fifth Circuit explained in <u>Capps v. N.L. Baroid-Indus., Inc.</u>, 784 F.2d at 618, " . . . while the borrowing employer could not discharge the plaintiff, it had the right to terminate his services with itself.  We believe this is the proper focus when considering who has the right to discharge the employee."  <u>See</u> <u>also</u>

15

Melancon v. Amoco Prod. Co., 834 F.2d at 1246 (same); Brown v. Union

Oil Co. of Cal., 984 F.2d at 676 (same); and, Hebron v. Union Oil Co. of

Cal., 634 F.2d at 247 (same).

(i)    The United States/Electric Boat contract gave the Navy authority to

terminate the Electric Boat's loaned employees, providing:

> PNS reserves the right to release EB Corp personnel if
> work completes earlier than planned or if work execution
> problems/delays cause a significant work stoppage.

Def. Ex. 531, § 3 (Workforce Mgt. Rqts), ¶ 8.  Based on this, Mr. Steven

Bailey had the right to terminate Mr. Nuckles and the other Electric Boat

employees from the HARTFORD availability and would have done so if

necessary.  Test. Bailey.

Moreover, the United States had the authority to exclude Mr.

Nuckles from Naval Submarine Base New London.  Test. Bailey.  The

power to exclude an employee from the work site effectively gives the

borrowing employer another way to "fire" the borrowed employee.  White

v. Bethlehem Steel Corp., 222 F.3d at 149.  This is a separate means by

which the United States also satisfies the eighth Ruiz factor.

(j)    Who had the obligation to pay the employee?  The last of the Ruiz factors

addresses the obligation to pay the borrowed servant.  Melancon v. Amoco

Prod. Co., 834 F.2d at 1244.  While Electric Boat paid Mr. Nuckles, it was

16

reimbursed by the United States for each hour he worked. Test. Parys.

Federal Acquisition Regulations ("FAR") permit such a payment. Test.

Parys; Def. Ex. 526, p. 67; 48 C.F.R. Part 52.216-7 (Allowable Cost and

Payment).

General maritime law provides that, even though the lending

company often has the direct obligation to pay workers loaned to another

company, the Ruiz payment factor is satisfied if the borrowing company

furnishes the funds from which the borrowed employee is paid. Capps v.

N.L. Baroid-Indus., Inc., 784 F.2d at 618.

In addition to paying Mr. Nuckles' salary, the United States paid

most of his worker's compensation on a pass-through basis after his

accident because this too was an allowable cost under the contract. Test.

Parys; Def. Ex. 526, p. 67; 48 C.F.R. Part 52.216-7 (Allowable Cost and

Payment).

(10)    Liability under section 905(b) may be based on the negligence of a vessel owner,

but may not be grounded on a breach of the warranty of seaworthiness. O'Hara v.

Weeks Marine, Inc., 294 F.3d 55 at 62; Gravatt v. City of New York, 226 F.3d at

116.

(11)    Section 905(b) of the LHWCA permits a ship repairman, such as Mr. Nuckles, to

bring suit against a shipowner, but not against his employer. 33 U.S.C. § 905(b);

O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 64 (2d Cir. 2002). Mr. Nuckles'

exclusive remedy against his employer consists of the collection of worker's

compensation benefits that he is entitled to through 33 U.S.C. § 905(a).

(12)    If the United States is a borrowing employer, then it is said to act in a "dual-

capacity," being both a vessel owner and an employer. In a dual capacity situation,

a ship repairman may not sue his borrowing employer, the United States in this

case, in any capacity, even as vessel owner. Heise v. The Fishing Co. of Alaska,

Inc., 79 F.3d 903, 907-08 (9th Cir. 1996); New v. Assoc. Painting Serv., Inc., 863

F.2d 1205, 1209-10 (5th Cir. 1989); Desrochers v. Sonat Exploration, et al., 1993

U.S. Dist. LEXIS 12,508 at * 26 (E.D. La. Sept. 9, 1993).

(13)    Plaintiff has the burden of proving not just that the injury occurred as alleged, but

further that the United States owed him a duty and breached that duty. Morris v.

Compagnie Maritime des Chargeurs Reunis, S.A., 832 F.2d 67, 69 (5th Cir. 1987),

cert. denied, 485 U.S. 1022, reh'g denied, 487 U.S. 1245 (1988).

(14)    Where the tort suffered by plaintiff is maritime and not of mere local concern, the

rights and liabilities of the parties arise out of and are dependent upon the general

maritime law and cannot be enlarged or impaired by State law. Robins Dry Dock

Co. v. Dahl, 266 U.S. 449, 457 (1925).

(15)    Under the general maritime law, the right of legal action against a shipowner by a

repairman aboard its vessel is statutorily granted as part of the LHWCA. The

18

LHWCA specifically states that "the remedy provided in this subsection shall be exclusive of all other remedies against the vessel." 33 U.S.C. § 905(b).

(16)    The exclusivity language of § 905(b) and the unique duties and liabilities of the shipowner as delineated by the Supreme Court completely occupy the field of a shipowner's liability to repairmen aboard its ship.  Accordingly, state law has no application to the case at bar.  Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984).

(17)    As a vessel owner, the government potentially owes plaintiff three general maritime law duties of care:  (1) the "turnover duty"; (2) the "active involvement" duty; and (3) the duty "to intervene."  Howlett v. Birkdale Shipping Co., 512 U.S. 92, 98-106 (1994); Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. at 156, 165-78; O'Hara v. Weeks, 294 F.3d at 65; Gravatt v. City of New York, 226 F.3d at 120-21.

(18)    The United States admits that the active control duty applies.  Although the government maintained active control of the area where plaintiff fell, this does not lead to the imposition of strict liability.  Masinter v. Tenneco Oil Co., 867 F.2d 892, 897 (5th Cir. 1989).

(19)    Mr. Nuckles, and others, suggest that the chain through which he fell was wired on one end, however, this speculation is based on the fact that a piece of wire was found nearby.  Test. Foltz, Gaynor and Martin.  Mr. Nuckles never saw the chain

in a wired condition and no one is sure which end was left hanging, either the end now attached by a closed shackle to a closed loop or the opposite end, which hangs on an open hook. Test. Nuckles. It is possible that Mr. Nuckles accidently unhooked the chain. Test. Klein; Def. Ex. 514. To establish liability, it is not sufficient that plaintiff show that the chain <u>might</u> have been wired; to prevail he must show that it <u>was</u> wired. <u>McMillan v. Marine Sulphur Shipping Co.</u>, 607 F.2d 1034, 1036-37 (2d Cir. 1979) (if the injury complained of might well have resulted from one of many causes, it is incumbent upon the plaintiff to produce evidence which will exclude the operation of those causes for which the master or the crew is under no legal obligation); <u>Harrelson v. United States</u>, 420 F.Supp. 788 (S.D. Ga. 1976) (same).

(20)    The test is one of whether the United States knew or by exercise of reasonable care would discover the condition. Restat. 2d (Torts) § 343(a); <u>Sinagra v. Atlantic Ocean Shipping</u>, Ltd., 182 F.Supp.2d 294, 301 (E.D.N.Y. 2001) (2d Cir. adopts Restat. 2d (Torts) as its guide to negligence under 905(b); <u>citing</u> <u>Evans v. Transportacion Maritime Mexicana S.S. "CAMPECHE,"</u> 639 F.2d 848, 852-53 & 55 (2d Cir. 1981)). The facts suggest that the United States could not have reasonably discovered a wired chain, for if it was wired, and if that could be seen, then Mr. Nuckles should have seen it. A shipowner is not liable for hidden defects that cannot be discovered by the exercise of due care. <u>Morris v. Campagnie</u>

20

Maritime Des Chargeurs Reunis, S.A., 832 F.2d 67, 68 (5th Cir. 1987). Obvious

defects are equally obvious to the harbor worker. Id.

(21)  If that chain was wired, the United States could not foresee that someone replace a

shackle with a weaker piece of wire. Proximate causation turns upon

foreseeability. See Christensen v. Georgia-Pacific Corp., 279 F.3d 807, 815 (9th

Cir. 2002) (in maritime cases, proximate cause cuts off liability for consequences

so far removed that there is no justification for imposing liability); Ituarte v.

United Car Transp. Corp., 1984 U.S. Dist. LEXIS 20045, at * 17, 19 (S.D.N.Y.

Jan. 27, 1984) (an essential ingredient of negligence is the foreseeability of harm);

Lubrano v. Companhia de Navegacao Lloyd Brasileiro, 575 F.Supp. 1541, 1547

(S.D.N.Y. 1983) (shipowner's liability is limited by the concepts of reliance and

foreseeability).

(22)  The Department of Labor, with its Occupational Safety and Health Standards for

Shipyard Employment (OSHA), 29 CFR § 1915, applicable "to all ship repairing,"

29 CFR § 1915.2, requires that the "responsibility for compliance with the

regulations of this part is placed on 'employers' as defined in § 1915.4," and that

"This part does not apply to owners, operators, agents or masters of vessels . . . "

29 CFR § 1915.3 (emphasis supplied). OSHA specifically exempts the United

States from its definition of the term "employer":

> (5) The term "employer" means a person engaged in a business
> affecting commerce who has employees, but does not include the

21

United States (not including the United States Postal Service) or any
State or political subdivision of a State.

29 U.S.C. § 652(5) (emphasis added).

(23)   The common law affirms that the United States cannot be an employer under

OSHA.  See Bruneau v. United States, 150 F.Supp.2d 303, 310-11 (D. Mass.

2001) (OSHA regulation is not binding on the United States, leaving the Air Force

a "rightful option" not to follow it) and Corey v. United States, 1996 U.S. Dist.

LEXIS 10173, at *18-19 (N.D.N.Y. Jul. 11, 1996) (OSHA does not provide a basis

of liability against the United States).

(24)   If somehow the OSHA regulations did apply, section 1915.17(c), addressing the

guarding of deck openings and hatches is pertinent.  The government's stanchion

and chain arrangement met the requirements of 1915.17(c), which requires that the

opening be guarded to a height of 36 inches.  The government's chain was 37

inches high.  Test. Cole and Klein.

(25)   The original design of the safety chain and stanchions on YNFB-41 is a

discretionary function, not subject to review by the Court.  Boyle v. United

Technologies Corp., 487 U.S. 500, 511 (1988); Baldassaro v. United States, 64

F.3d 206, 211 (5th Cir. 1995) (the design of a ship involves the weighing of

competing policy considerations that the discretionary function protects from

judicial scrutiny).

22

(26)   Given his nearly 20 years of experience as a ship repairman, Mr. Nuckles should
       be considered by the Court as a skilled expert at his job. <u>Polizzi v. M/V
       ZEPHROS II MONROVIA</u>, 860 F.2d 147, 149 (5th Cir. 1988) (harbor worker is
       presumed an experienced expert who will act with reasonable care).

(27)   General maritime law applies the doctrine of comparative fault. <u>United States v.
       Reliable Transfer Co.</u>, 421 U.S. 397 (1975). In longshore and harbor worker
       injury cases, it is an established principle of maritime law that the award of
       damages to a plaintiff, if any, must be reduced by the percentage of fault
       attributable to his own acts or omissions. <u>Edmonds v. Compagnie Generale
       Transatlantique</u>, 443 U.S. 256, 258 (1979). As Mr. Nuckles, by leaning on the
       chain, failed to exercise reasonable care, his award, if any, must be reduced by his
       own measure of fault.

(28)   Mr. Nuckles is unable to return to his former job. JTM, Pl. contentions, ¶ 6. But,
       this does not mean that he is unemployable for all purposes. Test. Murgo and
       Cestar. Although the fact that he cannot return to work as an outside machinist
       must be considered in determining his wage loss, he is required under the law to
       minimize his damages by earning what he can. <u>Thomas v. Jadranska Slobodna
       Plovidba</u>, 653 F.Supp. 1300, 1311 (E.D. Wis. 1987) (<u>citing</u> <u>Alexander v. Meiji
       Kaiun K.K.</u>, 195 F.Supp. 831, 834 (E.D. La. 1961).

Dated:  April 29, 2004.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KEVIN J. O'CONNER
United States Attorney

BRENDA M. GREEN
Assistant United States Attorney


MICHAEL A. DILAURO
STEPHEN G. FLYNN
Trial Attorneys
U.S. Department of Justice
Post Office Box 14271
Washington, D.C.  20044-4271
Telephone:  (202) 616-4019
Counsel for the United States

24

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was sent by Federal Express

this 29th day of April 2004, addressed to the following counsel of record:

> Eric J. Land, Esq.
> Stephen C. Embry, Esq.
> Embry & Neusner
> 118 Poquonnock Road
> Groton, Connecticut  06340
> Tel. (860) 449-0341


MICHAEL A. DILAURO

25