## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ROBERT NUCKLES,          )
                          )
           Plaintiff,     )
                          )
          v.           )     CIVIL NO. 3:01 CV 753 (MRK)
                          )
UNITED STATES OF AMERICA,  )
                          )
          Defendant.    )
_____)

### THE UNITED STATES' PRETRIAL BRIEF

### INTRODUCTION

At the time of his injury, Mr. Nuckles was a "borrowed servant" of the United

States. Although he was employed by Electric Boat Corporation ("Electric Boat"), the

United States had direct control over Mr. Nuckles and the work he performed; that work

was for the United States' benefit; it was undertaken pursuant to a contract between the

United States and Electric Boat; Mr. Nuckles made no objection to the arrangement;

Electric Boat relinquished control over him during this time; the government provided the

necessary equipment and the work spaces; the United States had the right to remove him

from the job and paid him through Electric Boat. Thus, the borrowed servant doctrine

shields United States from tort liability.

As for the accident itself, no one knows exactly how or why it occurred. It is

understood that Mr. Nuckles leaned on the chain, but why it gave way is unclear. Mr.

Nuckles believes it was improperly "wired" to the stanchion on one end instead of

shackled, but this is speculation. The only fact that supports this theory is that a piece of wire was found nearby on the deck after the accident. Mr. Nuckles did not see the chain wired and no one is sure which end was left hanging, the end which should be attached by a closed shackle to the stanchion or the opposite end, that by design hangs on an open hook. If, after the accident, the chain was left hanging from the shackled (or wired) end, then Mr. Nuckles must have accidentally unhooked it from the open end. If, instead, it hung from the open hook, then it may have been improperly attached at the other end with wire, rather than a shackle.

There is no evidence the United States knew of any unsafe condition concerning the chain. Mr. Nuckles argues that the chain was wired and that this should have been discovered by government inspection. Yet Mr. Nuckles' locker was situated directly in front of the chain for weeks preceding the accident and he did not notice a problem. Nor can Mr. Nuckles establish when the unsafe condition arose, precluding an argument that it existed for so long defendant should have somehow discovered it.

## FACTS

### I.    BORROWED SERVANT

Electric Boat, and one other company, build new nuclear submarines for the U.S. Navy. Aside from major overhauls, which are at times contracted out, the Navy performs all maintenance and repairs to its nuclear submarines. The Navy's ability to do this began

to be diminished significantly in the mid-1990's through reductions in workforce imposed

for budgetary reasons. By the late 1990's, the Navy, and its Portsmouth Naval Shipyard

in particular, had fewer qualified mechanics than needed to perform deferred maintenance

on its nuclear submarines. To get the work done, the Navy entered into a collaborative

arrangement, described as "partnering," that resulted in a pooling of Portsmouth Naval

Shipyard and Electric Boat employees. The repair of the nuclear submarine USS

HARTFORD (SSN 768), from April through June 1999, during a "selected restrictive

availability" ("SRA")[1] period, is an example of the partnering arrangement in effect.

Portsmouth Naval Shipyard repaired the HARTFORD while it was docked at the

United States' Naval Submarine Base New London, located in Groton, Connecticut. To

augment its workforce for the SRA, it contractually "borrowed" 31 Electric Boat

employees. The contract provided essentially for Electric Boat to provide skilled

workers, in various trades, and compensation to Electric Boat depended upon the actual

hours the workers spent on the submarine repair. The United States exercised control

over the nature and details of the work. Mr. Steven A. Bailey, a Portsmouth Naval

Shipyard zone manager, supervised all of the foremen on the evening shift and supervised

the mechanics, including Mr. Nuckles, through these foremen. No evidence suggests that

---

[1]    SRAs allow repairs and maintenance to be accomplished pierside, without
putting the submarine into a yard and taking it out of service for long.

Mr. Nuckles objected to this work arrangement or to the tasks he was asked to perform for the government.

While Mr. Nuckles provided his own personal protective equipment and hand tools, the government provided the specialized tools and equipment, as well as the work spaces for all personnel assigned to the HARTFORD job, including Electric Boat workers, per the terms of the United States/Electric Boat contract.

Although the United States did not have the ability to discharge Mr. Nuckles from Electric Boat, it had the right under the contract to remove him from the job itself. Moreover, the United States had the authority to exclude Mr. Nuckles from Naval Submarine Base New London, where YNFB-41 and HARTFORD were located.

While Electric Boat had the direct obligation to pay Mr. Nuckles, his salary was an allowable cost paid to Electric Boat per the terms of its contract with the United States. In addition to paying Mr. Nuckles' salary, the United States reimbursed Electric Boat for most of his worker's compensation benefits on a "pass-through" basis after his accident.

## II.    THE ACCIDENT

Mr. Nuckles' locker was placed flush against a four-inch high coaming that surrounded an open cargo hatch. The cargo hatch was surrounded by safety stanchions, with two chains, upper and lower, suspended between them. As noted, at one end the chain was, or should have been, shackled to the stanchion and, at the other, it was secured by a "hook and eye," to allow the chain to be removed for loading.

4

When this accident occurred, Mr. Nuckles was gathering tools and making plans with a co-worker, Mr. Michael Foltz, to complete their next assignment, the taking of "stave bearing readings" on board the submarine. As they spoke, Mr. Nuckles sat on his locker, leaned back against the upper chain and rested his arms upon it. The chain gave way and Mr. Nuckles fell backward through the cargo hatch onto the deck below.

It is unclear which end of the chain, which did not break, separated from the stanchion. Although he personally does not know why the chain gave way, plaintiff contends it did so because it was improperly attached to the stanchion with wire at the closed end, instead of a shackle. Conversely, defendant's expert believes the hook-end of the chain was inadvertently lifted from the "eye" welded to its stanchion by Mr. Nuckles as he unwisely reclined upon it.

Mr. Nuckles' locker was, and had been for weeks, situated directly in front of the chain through which he fell. Of the mechanics, supervisors and zone managers assigned to work on the HARTFORD job, Mr. Nuckles was in the best position to see and avoid the wired chain, if it was wired, and to correct it.

## III.    AFTER THE ACCIDENT

Although unable to return to his former job, Mr. Nuckles has been capable of performing less arduous work since August 2000 when he returned to Electric Boat, on light duty, for a month. He has not been employed since that time, but has instead been a student of computer science at Quinebaug Valley Community College, Danielson,

Connecticut. He intends to earn an associates degree and apply his education as an

assistant computer network manager.

## ARGUMENT

### I.     AS MR. NUCKLES WAS A BORROWED SERVANT, HIS LHWCA BENEFITS ARE HIS ONLY REMEDY

As a borrowed servant, Mr. Nuckles' only remedy against his "borrowing

employer," the United States, consists of the benefits paid to him under the Longshore

and Harborworkers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901-950, specifically,

33 U.S.C. § 905(a). His recourse against the United States, the borrowing employer, and

Electric Boat, his nominal employer, are one in the same. Although entitled to worker's

compensation, he may not receive damages in tort.

The Second Circuit has not yet had the opportunity to affirm that the borrowed

servant doctrine applies in the context of the LHWCA. See O'Hara v. Weeks, 294 F.3d

55, 68 (2d Cir. 2002). Other circuits that have considered the issue uniformly agree that it

does. See White v. Bethlehem Steel Corp., 222 F.3d 146, 149 (4th Cir. 2000); Peter v.

Hess Oil V.I. Corp., 903 F.2d 935, 939 (3d Cir. 1990); Ruiz v. Shell Oil Co., 413 F.2d

310 (5th Cir 1969); see also Rodriguez v. Barge Foss 343, 999 AMC 1593, 1595-96

(W.D. Wash. 1998) (applying the borrowed servant doctrine) and Canty v. A. Bottacchi,

S.A., et al., 849 F.Supp. 1552, 1558-59 (S.D. Fla. 1994) (same).

When two or more organizations might be an individual's employer, the borrowed

servant test is applied to decide which is the actual employer. Am. Stevedoring Ltd., v.

6

United States, 248 F.3d 54, 64 (2d Cir. 2001). Of the Third, Fourth and Fifth Circuits, the

borrowed servant general maritime law of the Fifth Circuit has been around the longest,

more than thirty years, and is most developed. The Fifth Circuit applies an extensive

nine-factor test originally set forth in Ruiz v. Shell Oil Co., 413 F.2d at 312-13 ("Ruiz

test"). The Ruiz factors are:

   a.     Who has control over the employee and the work he is performing,
            beyond mere suggestion of details or cooperation?

   b.     Whose work is being performed?

   c.     Was there an agreement, understanding, or meeting of the minds
            between the original and the borrowing employer?

   d.     Did the employee acquiesce in the new work situation?

   e.     Did the original employer terminate his relationship with the
            employee?

   f.     Who furnished [the] tools and place for performance?

   g.     Was the new employment over a considerable period of time?

   h.     Who had the right to discharge the employee?

   i.     Who had the obligation to pay the employee?

Melancon v. Amoco Prod. Co., 834 F.2d 1238, 1244 (5th Cir. 1988). An examination of

these factors shows that Mr. Nuckles meets each of them.

   a. Who had control over Mr. Nuckles and the work he was performing? The first

factor is most significant. See, e.g., White v. Bethlehem Steel Corp., 222 F.3d at 147-48,

and Hebron v. Union Oil Co. of Cal., 634 F.2d 245, 247 (5th Cir. 1981). Mr. Steven

7

Bailey, the Portsmouth Naval Shipyard zone manager on duty when Mr. Nuckles fell, has

testified that the Navy actively managed the HARTFORD job:

> Q.   . . . If I ask you who was running the Hartford availability,
> Portsmouth Naval Shipyard or E.B., how would you answer that
> question?
>
> A.   Portsmouth, obviously, was running the availability.
>
> Q.   Why do you say that?
>
> A.   Because Portsmouth Naval Shipyard was contracted to do the SRA
> on the Hartford and really responsible for any and all work that was
> done on the Hartford.

Bailey dep., Apr. 13, 2004, pp. 20-21, lines 23-9.

The United States/Electric Boat contract in place at the time of Mr. Nuckles' injury

bears this out. It effectively allowed the Navy to supplement its workforce with Electric

Boat workers. It is a simple labor agreement by which Electric Boat provided 31

workers, of which Mr. Nuckles was one, to the United States for three months. It did not

delineate specific repairs, for which Electric Boat would be responsible. The contract

provided simply that these 31 Electric Boat employees, characterized as "production

support," would assist Portsmouth Naval Shipyard in the completion of its work on

HARTFORD:

> The Contractor [Electric Boat] shall provide production support to
> assist PNSY [Portsmouth Naval Shipyard] with performing SRA [Selected
> Restrictive Availability] on USS HARTFORD (SSN-768) at SUBASE New
> London, CT as described in Section C.

8

Def. Ex. 531, § B (Supplies or Services and Prices/Costs). The contract goes on to state that, while Electric Boat will provide work assignments and will "overview" the Electric Boat mechanics, ultimate control will be retained by the United States. Specifically, it provides:

> The work performed by EB Corp. mechanics/supervisors will be
> overviewed by PNS project managers.

Def. Ex. 531, § 3, ¶ 3 (Workforce Mgt. Rqts). The United States retained the right to control working hours, overtime and work assignments. Mr. Steven Bailey could and did directly control Mr. Nuckles and the other mechanics through the foremen, also known as supervisors. Mr. Charles Martin, who was Mr. Nuckles' immediate foreman/supervisor, worked directly for Mr. Bailey:

Q.   Do you know who Mr. Martin is employed by?

. . .

A.   Electric Boat.

. . .

Q.   The work that you were undertaking for the United States Navy – it's
my understanding that Mr. Martin is an EB employee. I believe you
indicated that he was one of your supervisors; is that correct?

A.   That's correct.

Q.   Could you explain that relationship to me, that employment
relationship?

A.   Actually, it's no change from a Portsmouth Naval Shipyard foreman
working for me. Mr. Martin was working on this project. He was

assigned to me as one of -- as my employee for the period of time involved.

Q.     Was Mr. Nuckles an employee of yours?

A.     Mr. Nuckles worked for Mr. Martin.

Q.     And Mr. Martin would report to you?

A.     That's correct.

Bailey dep., Feb. 20, 2002, pp. 21-22, lines 19-20.[2] This point was reiterated by Mr.

Bailey two years later:

Q.     Just so that I understand this chain of command that was in place while working on the Hartford in May of '99, if you as one of the supervisors wanted a job done, and you wanted Electric Boat personnel to do this job, would you go to a foreman from E.B. or a supervisor from E.B. requesting that they got E.B. personnel to complete that task, or would you go to an E.B. employee and say, "Hey, I want you to do that task"?

A.     Your question doesn't apply. The reason it doesn't apply is because on the p.m. shift the foreman that I had available, whether he was a Portsmouth or an E.B., was still the foreman for the machinists. And in this particular case, it was Charlie Martin, who was an E.B. employee. He could very well have been a Portsmouth foreman. It didn't make any difference. As far as the mechanics, he has E.B. mechanics and Portsmouth mechanics working for him, and depending on the job and the expertise required, it wouldn't make any difference whether it was a Portsmouth or an E.B. employee, because you don't request work to be done specifically if a guy is from E.B. or from Portsmouth. You request the work to be done on the expertise that's available for it . . . .

---

[2]     Note: this deposition took place two years before the government raised the borrowed servant issue, as did those of Michael Foltz and Charles Martin, taken on January 23, 2002.

10

Bailey dep., Apr. 13, 2004, p. 17-18, lines 6-9. Mr. Martin confirms that Electric Boat personnel, including himself, supported Portsmouth Naval Shipyard:

> Q:    What were the Electric Boat personnel doing on [YNFB-41] that day?
>
> A:    That was our regular work shift that day. To support Portsmouth.

Martin dep., p. 7, lines 18-21. Another supervisor, Mark Gaynor, who oversaw painters on Mr. Nuckles' shift, confirms that, although he was nominally an Electric Boat employee, he worked for Mr. Bailey on the HARTFORD job:

> A:    I report to the lower level of the barge. There's some supervisors – the zone managers are located on one end of the barge and the supervisor's office was at the other end of the barge.
>
> Q:    What is the zone manager?
>
> A:    They control all the activities on whatever particular shift. They're like a project manager.
>
> Q:    And is the zone manager[, Mr. Steven Bailey,] a Portsmouth Naval Shipyard Employee?
>
> A:    Yes.

Gaynor dep., p. 12, lines 3-12. Mr. Gaynor, as well as his painters assigned to the evening shift, nominally an Electric Boat supervisor, worked directly for Mr. Bailey:

> Q:    Did you work for Mr. Bailey?
>
> A:    Yes.
>
> Q:    And that was true for the painters; is that correct?

11

A:     Yes.

Q:     How about people from different departments?  Would you have any
       knowledge what Mr. Gaynor's role would be with their employ?

A:     Mr. Bailey.

Q:     Excuse me.  Mr. Bailey[?]

A:     Mr. Bailey had cognizance over the entire shift, be it Portsmouth
       [Naval Shipyard] or EB people.  At that time Portsmouth was
       contracting EB to supplement their manpower.  And it wasn't
       uncommon for us to go on jobs where I or any other supervisor
       would take ten or twelve people with them to support the Portsmouth
       project.

Gaynor dep., p. 41, lines 8-23.  As the zone manager, Mr. Bailey was responsible for all

activities that occurred on his shift:

Q:     You had mentioned a Steve Bailey.  And I believe that you said that
       he was a zone manager?

A:     I believe that his title was the zone manager for Portsmouth Naval
       Shipyard.

Q:     And back in May of '99, what was the zone manager's duties, if you
       know?

A:     The only recollection that I have is that he was responsible for all the
       activities on that particular shift.

Gaynor dep., p. 35, lines 17-25.  To make these activities happen, Mr. Bailey used

Electric Boat and Portsmouth Naval Shipyard foremen and mechanics interchangeably:

Q.     Going back to the time of the accident, which was May the 14th,
       1999, I believe – in May of 1999, anyway, did you ever have a
       feeling that Portsmouth Naval Shipyard mechanics, which would

12

include outside machinists, and Electric Boat mechanics were being used interchangeably?

A.     They were being used interchangeably.

Q.     And why do you say that?

A.     Because they were experienced mechanics.  Once you grasp the level of experience of the mechanics working for you, at that point in time you make your work assignments based on that.

Q.     And would you ever make a work assignment directly to an Electric Boat mechanic?

A.     No.

Q.     How would you do that?

A.     It would be done through the foreman.

Q.     And would that foreman be an E.B. foreman, a Portsmouth foreman, or could it be either?

A.     It could be either.  In this particular case, it was an E.B. foreman, but it could be either one.

Q.     What about generally on the job; were there both types on the job?

A.     Right, they worked hand in hand.

Bailey dep., Apr. 13, 2004, p. 13-14, lines 9-10.  Plainly, the United States had control of the entire job, including the efforts of Mr. Nuckles.  It directly controlled Mr. Nuckles' supervisor, and through his supervisor, directly controlled him.

     b.  <u>Whose work is being performed</u>?  In applying the second factor, the Court must evaluate whose work is being performed.  <u>Standard Oil v. Anderson</u>, 212 U.S. at 220;

White v. Bethlehem Steel Corp., 222 F.3d at 149; and, Melancon v. Amoco Prod. Co.,

834 F.2d at 1244.  Without question, the work performed during the HARTFORD

availability was that of the United States.  Mr. James Fender, general counsel for

Portsmouth Naval Shipyard states:

> Q.     . . . [W]ould you be able to say whose work was being performed at
> the sub base in May of '99?
>
> A.     Oh, I certainly know that work was being performed by a team of
> federal employees from Portsmouth Naval Shipyard and persons
> employed by the private contractor, Electric Boat Corporation.
>
> Q.     And you know what the nature of the undertaking was in regards to
> the 768 [HARTFORD]?
>
> A.     It was to repair the submarine to return it to the fleet so we could
> perform its assigned mission.

Fender dep., p. 31, lines 9-21.  No witness will disagree with him.  Mr. Nuckles was

performing the government's work, repairs to its nuclear submarine HARTFORD.  When

his accident occurred, during the work shift, he was gathering tools and making plans

with a co-worker, Mr. Michael Foltz, to complete their next assignment, the taking of

"stave bearing readings" on board the submarine.

　　　c.  Was there an agreement, understanding, or meeting of the minds between

Electric Boat, the original employer, and the United States, the borrowing employer?  The

third of the nine factors requires a meeting of the minds between the United States and

Electric Boat.  Melancon v. Amoco Prod. Co., 834 F.2d at 1244.  A meeting of the minds

existed:  Portsmouth Naval Shipyard needed to augment its workforce with Electric Boat

14

mechanics to make necessary repairs to HARTFORD. Electric Boat, which was building

fewer new submarines, needed to keep Mr. Nuckles and others gainfully employed. To

satisfy the needs of both organizations, they entered into a "partnering" arrangement:

> Q.     . . . [W]hat is the term "partnering" to your understanding?
>
> A.     As the government had gone through tremendous drawdowns in its
>        industrial activities, not just the Navy, but the Army and the Air
>        Force, suddenly – or, not suddenly, but we were confronted with a
>        need for weapons platforms. And we had in the Navy deferred a lot
>        of necessary maintenance in the fast-attack SSN class of submarines,
>        and we were faced in late 1997 and early 1998 with the problem of
>        reduced employees in the naval shipyards . . . .

Fender dep., p. 53, lines 9-20. Because the workforce had been reduced, Portsmouth

Naval Shipyard did not have the skilled workers it needed to repair nuclear submarines,

like HARTFORD:

> Q.     And why didn't [the Joint Chiefs of Staff and Secretary of Defense]
>        just ask Portsmouth Naval Shipyard employees to do what needed to
>        be done?
>
> A.     Because big Navy and big DOD knew that we did not have the
>        requisite skills – all of the requisite skills that we needed for the
>        repair of complex weapons platforms such as nuclear submarines.
>
> Q.     Had Portsmouth Naval Shipyard had people who possessed those
>        skills in the past?
>
> A.     We certainly had, but through a series of reductions in force, I went
>        from roughly 10,000 employees in eight years to 2,800 employees,
>        and I lost valuable experience and valuable skills that I could never
>        recover.
>
> Q.     And approximately when did this drop in numbers occur?

15

A.    The drops actually began in 1988, '89 and carried through into 1995 and 1996.

Fender dep., p. 55-56, lines 9-3. Electric Boat benefitted from the partnering arrangement, which kept its workers employed:

Q.    Now, you've explained why the Navy needed to enlist Electric Boat's help in providing skilled employees.

A.    Yes, sir.

Q.    We know why the Navy needed to do that. What incentive did Electric Boat have to provide those employees?

A.    Well, Electric Boat, of course, would have its employees' salaries who otherwise might not have had productive work in the Groton area. They would be able to employ their people productively, and, also, Electric Boat realized that as a corporation they needed to diversify into repair work because there was – they could – they could look at the annual Department of Defense Authorizations and Appropriations Act and see how much money was there for new construction versus how much money was there for overhaul and repair. And Electric Boat Corporation, realizing that there was limited new construction, realized that if they wished to continue as a corporate entity, they needed to diversify into ship repair.

Fender dep., pp. 57-58, lines 8-7. The contract between the United States and Electric Boat is a labor agreement that sets out the terms of the understanding, as it affects the HARTFORD job. The partnering arrangement, which affected Mr. Nuckles and others, allowed the pooling of two workforces, one public and one private. It was through this arrangement that Mr. Nuckles was assigned to perform repairs on the HARTFORD, an effort managed by the United States.

16

d. Did Mr. Nuckles acquiesce in the new work situation? Mr. Nuckles began working as an outside machinist for Electric Boat in 1981. Until his accident on May 14, 1999, he worked continuously as an outside machinist on nuclear submarines built for the Navy. Periodically, as circumstances required, he worked on board YNFB-41, the site of his accident. He was familiar with the working conditions on board YNFB-41; and, he knew that Electric Boat and the government were separate entities. There is no evidence that he objected to his work environment or to the tasks he was asked to perform. He acquiesced in this arrangement.

e. Did Electric Boat terminate its relationship with Mr. Nuckles? The fifth Ruiz factor does not require complete termination of the relationship between the nominal employer, Electric Boat, and Mr. Nuckles; rather, it requires a temporary relinquishment of control during the period of borrowed employment. Melancon v. Amoco Prod. Co., 834 F.2d at 1246; Capps v. N.L. Baroid-Indus., Inc., 784 F.2d 615, 617-18 (5th Cir. 1986). The emphasis in evaluating this factor is on Electric Boat's relationship with Mr. Nuckles during the period that work was performed on HARTFORD. Melancon v. Amoco Prod. Co., 834 F.2d at 1246. During this time, Mr. Nuckles worked only on HARTFORD, not new submarine construction, Electric Boat's primary business. Hence, Electric Boat effectively relinquished control over Mr. Nuckles during this time.

f. Who furnished the tools and place for performance? While Mr. Nuckles provided his own personal protective equipment and hand tools, the government provided

17

all other necessary equipment, as well as the work spaces for Electric Boat personnel

assigned to the HARTFORD job. The contract states:

> PNS agrees to provide all necessary equipment and work spaces for EB
> Corp's personnel assigned to SSN 768 SRA [Selected Restrictive
> Availability]. EB Corp's mechanics shall provide their own personal hand
> tools and any other work apparel typically provided by their employer (e.g.,
> coveralls, tyvek suits, blast hoods, and leather palmed gloves).

Def. Ex. 531, § 3 (Workforce Mgt. Rqts), ¶ 4. In fact, the Navy did provide the

specialized tools required to perform the work:

> Q. I'd like to shift topics and talk about, you know, tools for a second.
> Mr. Nuckles, as I understand it, like other mechanics, had to provide
> his own hand tools?
>
> A. That's correct.
>
> Q. But there were also some tools that Portsmouth Naval Shipyard
> provided; is that right?
>
> A. Any specialty tools required for a job Portsmouth keeps on hand in a
> tool crib, and E.B. guys as well as the Portsmouth guys both had the
> authority to go and draw them out against their badge numbers.

Bailey dep., Apr. 13, 2004, p. 15-16, lines 16-4. Although Mr. Nuckles had to provide his

own hand tools, not uncommon in any construction trade, the United States provided the

specialized tools needed. It also dictated the place of performance of the actual work on

board the HARTFORD and the location of the staging area, YNFB-41, where government

and Electric Boat workers were interspersed:

> Q. When onboard the barge where Mr. Nuckles' locker was located,
> was there a separate place for the E.B. people and the Portsmouth

Naval Shipyard people?  In other words, were they segregated, or were they together?

A.    They were pretty much commingled.  Probably in that particular area where Mr. Nuckles was the majority was probably E.B. guys, but there was a couple of gang boxes there that belonged to Portsmouth guys, and they all pretty much, you know, worked together.

Bailey dep., Apr. 13, 2004, p. 16, lines 11-21.  The government and Electric Boat outside machinists were co-located because they were acting as a common workforce.

g.  Was the new employment over a considerable period of time?  There is no bright-line rule that defines a "considerable period of time."  Mr. Nuckles' accident occurred approximately five weeks into, about half way through, the HARTFORD job. In comparison, in Capps v. N.L. Baroid-Indus., Inc., 784 F.2d 618, the Court found plaintiff to be a borrowed servant even though that accident occurred on the first day of employment.  The Court opined that, while employment over a long period suggests borrowed servant status, employment for a short period does not inveigh against it.  If it were so, this element of the test would eliminate the application of the doctrine in the early days of a borrowed servant's employment.  See also Brown v. Union Oil Co. of Cal., 984 F.2d 674, 679 (5th Cir. 1979) (one month employment period is neutral); and, Canty v. A. Bottacchi, S.A., et al., 849 F.Supp. 1552, 1558-59 (S.D. Fla. 1994) (three days of employment is neutral).  Given that Mr. Nuckles accident occurred half way through the availability, this element should be satisfied.

19

h. <u>Who had the right to discharge Mr. Nuckles</u>? The right of discharge does not require that the United States have the ability to terminate Mr. Nuckles' employment with Electric Boat; rather, it requires only that the United States have the right to remove him from the job itself. As the Fifth Circuit explained in <u>Capps v. N.L. Baroid-Indus., Inc.</u>, 784 F.2d at 618, " . . . while the borrowing employer could not discharge the plaintiff, it had the right to terminate his services with itself. We believe this is the proper focus when considering who has the right to discharge the employee." <u>See</u> <u>also</u> <u>Melancon v.</u> <u>Amoco Prod. Co.</u>, 834 F.2d at 1246 (same); <u>Brown v. Union Oil Co. of Cal.</u>, 984 F.2d at 676 (same); and, <u>Hebron v. Union Oil Co. of Cal.</u>, 634 F.2d at 247 (same).

The contract gave the United States authority to terminate the Electric Boat's loaned employees, providing:

> PNS reserves the right to release EB Corp personnel if work completes earlier than planned or if work execution problems/delays cause a significant work stoppage.

Def. Ex. 531, § 3 (Workforce Mgt. Rqts), ¶ 8. Mr. Steven Bailey had the right to terminate Mr. Nuckles and the other Electric Boat employees from the HARTFORD availability and would have done so if necessary. Mr. Fender, corporate counsel, understood that Mr. Bailey had authority to do so:

> Q.    To your knowledge, did Portsmouth Naval Shipyard personnel have the ability to fire Mr. Nuckles from his employ with Electric Boat Corporation?
>
> A.    They could not order Mr. Nuckles' termination from his employment with Electric Boat, but they could – they did not – if his work was

20

not acceptable, they could have him removed from the workforce on the vessel.

Fender dep., p. 37, lines 5-12. Mr. Bailey knew he could pull mechanics off the job if necessary:

> Q.    You have a Portsmouth employee that you are supervising, and the Portsmouth employee, for whatever reason, personal disagreement, whatever, tells you to shove it, right to your face, shove it, could you tell that individual to leave at that point, to leave the work site?
>
> A.    I felt the ability – or, the authority to do that, yes.
>
> Q.    Same question as to an E.B. employee –
>
> A.    Yes.

Bailey dep., Apr. 13, 2004, p. 10, lines 4-13. His handling of such a situation would not differ depending on whether the employee was an Electric Boat or a government worker:

> Q.    . . . [W]hat I really want to know is if in your mind there was a difference between a Portsmouth employee, where you were to have your position as also being a Portsmouth employee and a Portsmouth supervisor, versus an Electric Boat employee.
>
> A.    No.
>
> Q.    Okay.
>
> A.    As far as I'm concerned, they're all working for me for one goal, and they all fall under the same guidelines.

Bailey dep., Apr. 13, 2004, p. 12, lines 6-16. Moreover, the United States had the authority to exclude Mr. Nuckles from Naval Submarine Base New London, where YNFB-41 and HARTFORD were located:

21

Q.     We talked a little bit about termination from the job.  Let me ask a more general question.  Do you understand the Navy to have the ability to exclude people from its naval bases?

A.     The Navy does have the authority to exclude people from their naval bases.

Q.     And would that include the sub base down in Groton where the work on Hartford was performed?

A.     Yes, it would.

Bailey dep., Apr. 13, 2004, pp. 14-15, lines 16-2.  The power to exclude an employee from the work site effectively gives the borrowing employer another way to "fire" the borrowed employee.  White v. Bethlehem Steel Corp., 222 F.3d at 149.  This is a separate means by which the United States also satisfies the eighth Ruiz factor.

        i.  Who had the obligation to pay Mr. Nuckles?  The last of the Ruiz factors addresses the obligation to pay the borrowed servant.  Melancon v. Amoco Prod. Co., 834 F.2d at 1244.  While Electric Boat paid Mr. Nuckles, it was reimbursed by the United States, based upon a formula that assumed a set average hourly wage (including benefits) for outside machinists (even though Mr. Nuckles' actual rate might be slightly higher or lower) multiplied by the number of hours all of the outside machinists worked on the job.  Federal Acquisition Regulations ("FAR") permit such a payment.  48 C.F.R. Part 52.216-7 (Allowable Cost and Payment).  General maritime law provides that, even though the lending company often has the direct obligation to pay workers loaned to another company, the Ruiz payment factor is satisfied if the borrowing company furnishes the

22

funds from which the borrowed employee is paid. <u>Capps v. N.L. Baroid-Indus., Inc.</u>, 784 F.2d at 618.

In addition to paying Mr. Nuckles' salary, the United States paid most of his worker's compensation on a pass-through basis after his accident because this too was an allowable cost under the contract. 48 C.F.R. Part 52.216-7 (Allowable Cost and Payment).

## II.  ALTHOUGH THE UNITED STATES HAD ACTIVE CONTROL, IT IS NOT LIABLE TO MR. NUCKLES

### A. The United States had Active Control of the Vessel.

If Mr. Nuckles is allowed to maintain his suit against the United States, it is as a shipowner; 33 U.S.C. § 905(b). <u>O'Hara v. Weeks Marine, Inc.</u>, 294 F.3d 55, 64 (2d Cir. 2002). As a vessel owner, the government potentially owes plaintiff three general maritime law duties of care:  (1) the "turnover duty"; (2) the "active involvement" duty; and (3) the duty "to intervene." <u>Howlett v. Birkdale Shipping Co.</u>, 512 U.S. 92, 98-106 (1994); <u>Scindia Steam Navigation Co. v. De Los Santos</u>, 451 U.S. at 156, 165-78; <u>O'Hara v. Weeks</u>, 294 F.3d at 65; <u>Gravatt v. City of New York</u>, 226 F.3d at 120-21. The United States maintains that the active control duty applies. Even though the government maintained active control of the area where plaintiff fell, this does <u>not</u> result in strict liability. <u>Masinter v. Tenneco Oil Co.</u>, 867 F.2d 892, 897 (5th Cir. 1989). Plaintiff must show the chain was wired open or otherwise unsafe and, if it was, that United States knew or should have known about it.

23

**B.    No One Knows Whether the Chain Was Actually Wired.**

No one will testify they saw the chain wired to the stanchion.  A number of witnesses have speculated that the chain was wired on one end, based on the fact that a piece of wire was later found on the deck nearby.  Mr. Nuckles never saw the chain in a wired condition and no one is sure which end was left hanging.  The United States' contends Mr. Nuckles accidently unhooked the chain.  The assertion that the chain was wired is conjecture.  To establish liability, it is not sufficient that plaintiff show that the chain <u>might</u> have been wired; to prevail he must show that it <u>was</u> wired or otherwise unsafe:

> The plaintiff must establish directly or by just inference some want of care on the part of the master or the crew of the ship to which his injury may fairly and reasonably be traced.  It is not enough for the plaintiff to prove that the negligence might perhaps have caused the injury.  If the injury complained of might well have resulted from one of many causes, it is incumbent upon the plaintiff to produce evidence which will exclude the operation of those causes for which the master or the crew is under no legal obligation.  If the cause of the injury may be as reasonably attributed to an act for which the master and crew are not liable as to one for which they are, the plaintiff has not sustained the burden of fastening tortious conduct upon the master or crew. The evidence showing negligence must come from witnesses who speak as knowers, not as guessers.

<u>McMillan v. Marine Sulphur Shipping Co.</u>, 607 F.2d 1034, 1036-37 (2d Cir. 1979) (<u>quoting</u> 1A Benedict, Admiralty § 118 at 6-25 (7th ed. 1979)).  In another harbor worker case against the U.S. Navy, one involving an object that fell mysteriously and struck the plaintiff working in a tank below, the Court wrote:

> This case began as a mystery and ends as an enigma.  Neither this court nor anyone else can say if, when or by whom any tool or object was left on the grating.  A reliable basis for any ultimate finding of shipowner liability is completely lacking.  One can reach the conclusion that plaintiff was struck by a falling metal object which was resting on the grating before it was accidentally dislodged by Schuenemann.  But to proceed from that point is to indulge in the merest speculation.

Harrelson v. United States, 420 F.Supp. 788 (S.D. Ga. 1976).  This case is the same, for while it is well understood that Mr. Nuckles fell through the chain, why he did so is far less clear.

### B.    If the Chain Was Wired, That Condition Was Hidden to the Government or, if Not, Was as Visible to Mr. Nuckles as Anyone Else

Mr. Nuckles has produced no evidence to show the condition of the chain prior to his leaning against it.  Yet, he assumes that it was wired and based on this, his liability expert maintains that the United States should have, by making daily inspections of this and every other chain on the vessel, discovered and fixed it.  But, Mr. Nuckles cannot explain why, if the chain was wired, he did not see it.  Nor does anyone know how long a time the chain was wired, if it was so.

Mr. Nuckles' locker was, for weeks, right in front of the chain through which he fell; that is how he was able to lean against it and why it was comfortable for him to do so.  "An obvious defect should be as apparent to the [contractor and ship repairman] as to the shipowner."  Polizzi v. M/V ZEPHROS MONROVIA, 860 F.2d 147, 149 (5th Cir. 1988).  If Mr. Nuckles, who periodically returned to his toolbox where he kept his

25

clothing and exchanged tools during the weeks before the accident, was unable to see a

wire on a chain a few feet away, then it is not reasonable to expect that the government

should find it. A shipowner is not liable for hidden defects that cannot be discovered by

the exercise of due care. Morris v. Campagnie Maritime Des Chargeurs Reunis, S.A.,

832 F.2d 67, 68 (5th Cir. 1987). Obvious defects are equally obvious to the harbor

worker. Id.

      **C.**    **OSHA Standards Do Not Apply to the United States;**
                  **and, Though They Do Not, the Chain Surrounding the**
                  **Hatch Was in Compliance**

Mr. Cole cites OSHA regulation 1915.73(d) and concludes: "It is my opinion that

the above-cited regulations were not complied with by any of the employers at this work

site, and that this contributed to Mr. Nuckles' injury." Cole report, p. 3. In fact,

compliance by the government was unnecessary because the OSHA regulations do not

bind the United States. While OSHA regulation places the obligation for OSHA

compliance upon an employer, 29 C.F.R. § 1915.3, the United States is statutorily exempt

from the definition of the term "employer" as it applies to OSHA regulation:

    **§ 652. Definitions.**

* * *

(5) The term "employer" means a person engaged in a business affecting
commerce who has employees, <u>but does not include the United States</u> (not
including the United States Postal Service) or any State or political
subdivision of a State.

29 U.S.C. § 652(5) (emphasis added).

26

The common law affirms that the United States cannot be an employer under OSHA. In Bruneau v. United States, 150 F.Supp.2d 303, 310-11 (D.Mass. 2001), the plaintiff, a firefighter injured in an Air Force fire rescue trainer, argued that the trainer failed to comply with OSHA general industry standards concerning the presence of hazards in confined spaces, 29 C.F.R. § 1910.46.  The Bruneau Court held that the OSHA regulation in question is "not binding on the United States, leaving the Air Force a 'rightful option' not to follow it." Bruneau v. United States, 150 F.Supp.2d at 311.[3]

In Corey v. United States, 1996 U.S. Dist. LEXIS 10173, at *3 (N.D.N.Y. Jul. 11, 1996), plaintiff was hired by the United States Navy to alter the electrical distribution systems in several buildings on Griffiss Air Force Base in Rome, New York. He suffered injuries when his head contacted high voltage electrical cables.  Plaintiff argued that the United States should have approved an Accident Prevention Plan which complied with OSHA.  The Corey Court held that "OSHA does not provide a basis of liability against the United States." Corey v. United States, at * 18-19.[4]  The OSHA regulations that Mr. Cole relies upon do not bind the United States.

---

[3]     The Bruneau Court cited Berkovitz v. United States, 486 U.S. 531, 536 (1988), a discretionary function case, in support.  The Court reasoned that the United States had discretion in designing the trainer.  Likewise, in the Nuckles case, the design of YNFB-41 is a discretionary function, not subject to review by the Court.  Boyle v. United Technologies Corp., 487 U.S. 500, 511 (1988); Baldassaro v. United States, 64 F.3d 206, 211 (5th Cir. 1995).

[4]     The Corey Court held that, because OSHA regulations did not prescribe a course of action for a government employee to follow, the discretionary function exception applied.

27

Moreover, OSHA section 1915.73(d), upon which Mr. Cole relies, does not apply at all. It instead addresses unguarded, raised, flat walking surfaces. Mr. Nuckles fell through a deck hatch. Section 1915.73(c) addresses hatches, to provide: ". . . the edge of the opening shall be guarded in the working area to a height of 36 to 42 inches . . . ." As Mr. Cole's report points out, the chain met this standard: "The sag in the upper chain yielded a height above the deck of 37 inches at its lowest point." Cole report, p. 2. Thus, if OSHA regulations did somehow apply to a government vessel, the cargo loading hatch on board YNFB-41 met those standards.

## III.    MR NUCKLES' RECOVERY, IF ANY, MUST BE REDUCED BY THE MEASURE OF HIS COMPARATIVE FAULT

General maritime law applies the doctrine of comparative fault. United States v. Reliable Transfer Co., 421 U.S. 397 (1975). In longshore and harbor worker injury cases, it is an established principle of maritime law that the award of damages to plaintiff, if any, must be reduced by the percentage of fault attributable to his own acts or omissions. Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 258 (1979). As Mr. Nuckles, by leaning back against the chain, failed to exercise reasonable care, his award, if any, must be reduced to the extent that he was at fault. The chain and stanchion arrangement that Mr. Nuckles encountered on YNFB-41 was, as confirmed by plaintiff's expert, extremely common:

> Q.    Let's see. The next sentence talks about the awareness of the ship's crew and shipyard workers of deck openings such as this. Now you just told me that they're very common on Navy ships, Coast Guard

vessels and in commercial industry. Should a shipyard worker such as Mr. Nuckles be aware of the existence of an opening like this?

A.     Yes.

Q.     And should he expect to encounter them in the execution of his duties?

A.     Yes.

Cole dep., pp. 62-63, lines 18-4. Mr. Nuckles should not have leaned on the chain

because, as his liability expert admits, it is unsafe to do so:

Q.     Well, let's assume that he was leaning against the chain. Was that safe behavior on his part?

A.     In my opinion, that would not be a safe thing to do. And I say that because, of course, I've been investigating seamen and shipyard workers who get injured for the last thirty years.

Cole dep. p. 31, lines 6-13. Mr. Nuckles' foreman/supervisor, Mr. Charles Martin,

believes that the chains are not there to be leaned upon:

Q:     The chains aren't for people to lean on, are they?

A:     Me personally, no, I wouldn't lean on it.

Martin dep., p. 27, lines 10-12.

## IV.     PLAINTIFF SHOULD BE EXPECTED TO RETURN TO WORK AS A COMPUTER SUPPORT TECHNICIAN

Both parties agree that Mr. Nuckles is unable to return to his former job. But, this

does not mean that he is unemployable for all purposes. Although the fact that he cannot

return to work as an outside machinist must be considered in determining his wage loss,

he is required under the law to minimize his damages by earning what he can. Thomas v.

29

Jadranska Slobodna Plovidba, 653 F.Supp. 1300, 1311 (E.D. Wis. 1987) (citing

Alexander v. Meiji Kaiun K.K., 195 F.Supp. 831, 834 (E.D. La. 1961).

    Mr. Nuckles has been capable of working since at least August 2000, when he

returned to Electric Boat for one month. He has not worked since then, but has instead

been retraining for a new career. As he has done so, the United States questions the view

of his vocational expert that this education will not improve his earnings capacity:

> Q.    So you're saying that even if he completes the program, you don't think that much improves his employment potential?
>
> A.    That's exactly what I'm saying.

Murgo dep., p. 44, lines 21-24.

    In fact, Mr. Nuckles, who has the greatest interest in accurately assessing his

employment opportunities, intends to work as a computer support technician:

> Q.    What kind of job are you looking for? What do you have in mind?
>
> A.    Well, because I don't have a lot of experience in the field, I'm looking for something, you know, maybe at a school or something like that to get a start.
>
> Q.    And what sort of work would you be doing for them?
>
> A.    Maintaining their computer system, the internal network system.
>
> Q.    Would you be like a network manager?
>
> A.    It would be lower level where you'd be assisting a network manager.
>
> Q.    But you are planning then it sounds like to use the education that you're receiving now –

A.      Yes.

Q.      – in getting a job in the future?

A.      Yes.

Q.      So you're planning to work in the field?

A.      Yes.

Nuckles dep., Dec. 18, 2003, pp. 29-30, lines 10-3.  The wages of a computer support

technician are similar to those of an outside machinist.

## CONCLUSION

The borrowed servant doctrine provides the United States with immunity from Mr.

Nuckles' suit against it.  Should the Court reach the facts surrounding the accident, it is

plain that Mr. Nuckles leaned against a safety chain, using it as a seatback, and that the

chain did not support his weight.  Why it failed is unknown.  Mr. Nuckles claims it was

wired.  That possibility cannot be irrefutably disproved.  But, while it cannot be

disproved, the evidence does not support a finding by the Court that it was more likely

than not that the chain was wired and that the United States should have discovered this

condition.  Accordingly, the United States submits the Court should find it not liable for

Mr. Nuckles' injuries.

Dated:  April 29, 2004.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

31

KEVIN J. O'CONNER
United States Attorney

BRENDA M. GREEN
Assistant United States Attorney


*Michael A DiLauro*

MICHAEL A. DILAURO
STEPHEN G. FLYNN
Trial Attorneys
U.S. Department of Justice
Post Office Box 14271
Washington, D.C.  20044-4271
Telephone:  (202) 616-4019
Counsel for the United States

32

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was sent by Federal Express

this 29th day of April 2004, addressed to the following counsel of record:

> Eric J. Land, Esq.
> Stephen C. Embry, Esq.
> Embry & Neusner
> 118 Poquonnock Road
> Groton, Connecticut  06340
> Tel. (860) 449-0341


_____
MICHAEL A. DILAURO

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was sent by Federal Express

this 29th day of April 2004, addressed to the following counsel of record:

> Eric J. Land, Esq.
> Stephen C. Embry, Esq.
> Embry & Neusner
> 118 Poquonnock Road
> Groton, Connecticut 06340
> Tel. (860) 449-0341


_Michael A DiL_
MICHAEL A. DILAURO

25